JAMES VON TERSCH, appellee, v. NIS A. AHRENDSEN et al., appellants.

No. 49771.

(Reported in 99 N.W.2d 287)

NOVEMBER 17, 1959.

Stilwill & Wilson, of Sioux City, and Larson & Carr, of Charles City, for appellants.

Marvin J. Klass, of Sioux City, and Burton Dull, of Le-Mars, for appellee.

THORNTON, J.—Defendants are father and son and partners engaged in farming. Their farming operations consisted of two farms. One farm of 425 acres, and one of 385 acres, on which plaintiff resided and which was primarily a dairy farm. Plaintiff is a married man, forty-three years of age and the father of seven children ranging in age from six to seventeen years. Plaintiff first started to work for the defendants on a part-time basis in March of 1957. At that time he also operated a milk route. On February 1, 1958, plaintiff started work on a full-time basis for defendants. His work included milking some 70 head of cows and taking complete care of them and what calves were on the farm. When he was first employed ground feed for the cows was purchased in town. In January of 1958 a hammermill grinder was moved from the 425-acre farm to the dairy farm. The first few times the grinder was used on the dairy farm the defendants operated it. There is evidence that plaintiff operated the grinder as few as two and as many as five or six times before he received the injury that is the basis of this lawsuit. On that day while plaintiff was operating the grinder he slipped on the muddy ground and the grease fitting protruding from the power take-off shaft caught the buttonhole of his left sleeve, he was pulled into the shaft, his arm wrapped around the shaft and he was severely injured. It was necessary that his left arm be amputated just below the elbow.

On the trial the jury returned a verdict for the plaintiff in the sum of $35,000.

I. Defendants urge four propositions for reversal. Two of them are closely related on the question of liability and will be considered together. Two specifications of negligence were submitted to the jury, that defendants were negligent in failing to provide plaintiff with a proper guard or shield which could be placed around the power take-off shaft, and in permitting the plaintiff to operate said grinder when attached to said tractor without proper instructions or warning relative to the danger in the operation thereof when the power take-off shaft was not covered with a guard or shield. Defendants contend, as a matter of law, there was no negligence on the part of defendants which was the proximate cause of the injury; the danger of using the unguarded power take-off shaft was so obvious to plaintiff it

was unnecessary to warn or instruct him and he had full knowledge of the danger and no warning was necessary. The evidence, viewed in the light most favorable to plaintiff, shows the greater part of his adult life he had been engaged as a truck driver and as a youth and for a short period in later years had been employed on a farm but at no time had he operated or become familiar with machinery using a power take-off. All of plaintiff's time during his part-time employment with defendants was spent in milking and caring for the dairy cattle. He used a tractor while so doing but not the power take-off. After he was employed on a full-time basis he could not have used the grinder more than five or six times, some of these may have been assisting defendants. He testified defendants did not warn him concerning the power take-off or advise him there was a shield that came with the power take-off assembly and they had it on the 425-acre farm, and he did not know a shield was made for the power take-off. Defendants purchased the feed grinder in 1947. At that time it was operated by a belt and pulley attachment. About four or five years ago defendants purchased the power take-off assembly and the shield was included in the assembly. This shield was never attached to the power take-off attachment at any time while plaintiff used it, the shield was left on defendants' 425-acre farm. After the injury to plaintiff, defendants put the shield on the power take-off. The grease fitting on the power take-off shaft protrudes about one-half inch. This grease fitting and the entire power take-off assembly are completely covered when the shield is in place and it is impossible to come in contact with the fast spinning of the power take-off shaft. Plaintiff had not greased the grinder or shaft and he did not know of the protruding grease fitting. Defendants did not warn plaintiff in any way concerning the power take-off or the grease fitting. Both defendants testified the custom relative to the use of shields on power take-off farm machinery was fifty per cent. And defendant Nis Ahrendsen testified, with respect to grinders, that for the past four or five years one could not be purchased with a power take-off assembly without having a shield attached.

It is the rule of the common law and of this court that the employer must use reasonable care to provide and maintain

a reasonably safe place for his employees to work and the same care is required to provide and maintain reasonably safe appliances, machinery and tools with which to work. Erickson v. Erickson, 250 Iowa 491, 94 N.W.2d 728, 732 (February 1959); O'Reagan v. Daniels, 241 Iowa 1199, 1205, 44 N.W.2d 666, 669, and citations; and annotation, 67 A. L. R.2d 1120, 1130.

Upon furnishing a shield, see Johnson v. Kinney, 232 Iowa 1016, 1028, 7 N.W.2d 188, 194, 144 A. L. R. 997. Therein this court said:

"No reason is suggested why this shaft could not have been covered with the guard which appellants had. It would have been a simple task requiring but a few minutes time."

This statement is particularly applicable here. One defendant testified, "It takes about four or five minutes to attach the end of this safety device to the grinder side. It is quite a simple operation. * * * It would take about a minute or two to attach the end of the shield which is closest to the tractor so that the power take-off will be completely guarded."

■ Clearly there is substantial evidence the defendants were negligent in not furnishing plaintiff reasonably safe machinery.

■ Defendants' contention that the danger of the revolving power take-off was so obvious that it was unnecessary to warn plaintiff is not borne out by the evidence. We have seen plaintiff had no prior experience with power take-off machinery. Defendants knew they had a shield. They knew of the protruding grease fitting. Neither was known to plaintiff. Plaintiff's answer on cross-examination to the effect you would expect all machinery to be dangerous cannot be taken to mean he knew of and appreciated the danger. Particularly is this true when in the next answer he said, "Well, they probably could have told me some things I didn't know about it." Plaintiff, on direct examination, testified he felt it was reasonably safe to operate the grinder. The specification of negligence submitted the failure to warn or instruct relative to the danger in the operation thereof when the power take-off was not covered with a guard or shield—not the failure to warn or instruct generally, but when the power take-off was not covered by a shield.

Under the circumstances presented it was a proper question for the jury to decide whether or not a reasonably prudent man would instruct or warn the power take-off uncovered was dangerous and there is a shield on the 425-acre farm that will completely cover the power take-off. A small grease fitting can of course be seen, but it is not so obvious to an employee who has the job of operating the grinder and keeping the hopper filled. Erickson v. Erickson, supra. We do not have here an open and obvious danger as in Anderson v. Sheuerman, 232 Iowa 705, 6 N.W.2d 125, wherein the plaintiff was burned while putting out a fire of burning leaves. The danger of fire is well known to all. This specification of negligence was properly submitted. Lang v. Hedrick, 229 Iowa 766, 295 N.W. 107; Welch v. Corrigan, 255 Wis. 58, 38 N.W.2d 148; and annotation, 67 A. L. R.2d 1120, 1176.

The failure to act in each specification of negligence could properly be found to be the proximate cause of the injury. If the shield had been in place the injury could not have occurred and if plaintiff were properly instructed he could have placed the shield over the power take-off or have been aware of the danger. It can fairly be said the injury would not have occurred except for one of the foregoing. Either could be the efficient, producing cause. Price v. McNeill, 237 Iowa 1120, 1124, 24 N.W.2d 464, 466; Bell v. Brown, 214 Iowa 370, 239 N.W. 785; and annotation, 67 A. L. R.2d 1120, 1167.

II. Defendants contend error was committed in admitting testimony of a mathematician as to the present value of the loss or impairment of general earning capacity and in the use of a discount rate other than the legal rate of interest.

Plaintiff called a local banker, who testified, over objection, three per cent per annum would be a fair return on a safe trust investment in the area.

Plaintiff also called the head of the Department of Mathematics at Westmar College, LeMars, Iowa, Mrs. Ellen Oliver. Over objection, she testified, using logarithms to fifth place, $73,349.60 would be required to provide a monthly income of $331 (a sum which, from the evidence, could be found to be plaintiff's monthly income at the time of the injury) for 26.81 years (the life expectancy of plaintiff as shown by the mortality

tables stipulated by the parties) figured at 3% per annum. The witness also testified, at the same rate it would take $221.60 to provide an income of $1.00 per month for such period, and on cross-examination $172.50 would be required to provide an annual income of $12 for 26 years figured at 5%, and in each instance at the end of the period the fund would be exhausted.

We have not heretofore passed upon the questions presented. If this evidence is admissible, it is admissible to aid the jury in making their determination of the sum to be awarded plaintiff as the present value of the loss or impairment of future general earning capacity occasioned by permanent injuries, if any, and is to be taken into consideration, by the jury, with all of the other facts and circumstances bearing thereon shown in the evidence in making their determination.

The testimony here was not testimony of the cost of an annuity but testimony of the present value of the sum necessary to allow plaintiff a monthly income for the remainder of his life expectancy. No question of profit to an insurance or investment company or of undisclosed factors is involved.

In the recent case of Farmers Union Federated Cooperative Shipping Assn. v. McChesney, 251 F.2d 441, 444, the Circuit Court of Appeals for the Eighth Circuit said, "To assist the jury in determining the present cash value of lost future earnings, the testimony of an actuary with reference to the present cash value or the introduction of present worth tables is entirely proper."

In Heppner v. Atchison, Topeka and Santa Fe Railway Co., 297 S.W.2d 497, 507, the Supreme Court of Missouri held testimony of an actuary similar to the testimony before us was not inadmissible.

In Vicksburg and M. R. Co. v. Putnam, 118 U. S. 545, 554, 7 S. Ct. 1, 2, 30 L. Ed. 257, 258, the Supreme Court of the United States said, "In order to assist the jury in making such an estimate, standard life and annuity tables, showing at any age the probable duration of life, and the present value of a life annuity, are competent evidence." (Citing cases)

A few of the other cases approving the use of annuity tables on this question are: Jones v. Chicago Great Western R. Co., 97 Neb. 306, 149 N.W. 813, 816; Texas & New Orleans Railroad

Co. v. Jacks, Tex. Civ. App., 306 S.W.2d 790, 796; Jones v. Eppler, Okla., 266 P.2d 451, 456, 48 A. L. R.2d 333; Pauly v. McCarthy, 109 Utah 431, 184 P.2d 123, 129; Spence v. Commercial Motor Freight, 99 Ohio App. 143, 127 N.E.2d 427, 432, and annotation, 53 A. L. R.2d 1454.

 The contention the legal rate of interest should be used in reducing the loss of future earnings to their present value and not the rate for safe investments in the locality is without merit. The reasoning of the authorities cited by defendants does not commend itself to us. The rate to be used is the one found by the jury from the evidence to be fairly expected from reasonably safe investments which a person of ordinary prudence, but without particular financial experience or skill, could make in the locality. Southern Pac. Co. v. Klinge, 10 Cir., Utah, 65 F.2d 85, 87. Both 3% and 5% were placed before the jury, no prejudice resulted to defendants.

We conclude evidence of the present value of the loss or impairment of future general earning capacity as presented here is admissible.

 III. Defendants further contend the verdict of $35,000 is excessive and not sustained by the evidence and appeared to have been influenced by passion and prejudice.

The evidence on damages in this case supports the verdict. Plaintiff was in good health and an able-bodied man prior to the accident. He lost his left arm from the elbow, injured his right shoulder, arm, and two fingers of his right hand, and received a severe burn on his right thigh. He now wears an artificial arm. His medical and hospital bills at the time of trial amount to $784.50. Expenses incidental to the artificial arm for the balance of his life could fairly be computed at $4000 to $5000; his loss of earnings to the time of trial at $1000 to $2000; the present worth of his loss of future earnings based on his life expectancy, figuring $125 as the amount of the monthly reduction, at $27,700. In addition there is much evidence of past and future pain and suffering and future medical and hospital costs. At the time of trial plaintiff was still employed by defendants at a reduced compensation of one half the cash monthly figure. In addition he received free rent, milk, and hogs to butcher. There is no indication this employment will continue, in fact the evi-

dence shows plaintiff's wife and sons are doing much of the work. This could indicate the probability the employment would be temporary and the reduction of cash income for plaintiff was greater than $125 per month.

The trial court, in passing on the motion for a new trial and judgment notwithstanding the verdict, said:

"In the instant case the jury that assessed the amount of damages was entirely familiar with the cost of living and the ability for an incapacitated man to find employment, considering his education and past experience.

"The verdict in this case was $35,000 and when the court learned of the amount of the verdict it was not of such size as to shock the conscience of the court, * * *."

 The allowance of damages is primarily for the jury and we should not substitute our judgment for theirs unless it clearly appears the verdict is the result of passion and prejudice or is unconscionable or clearly not warranted by the evidence. Soreide v. Vilas & Co., 247 Iowa 1139, 1153, 78 N.W.2d 41, and citations. And we are reluctant to interfere where the trial court who has the benefit of seeing and hearing the witnesses and observing the jury does not disturb the verdict. Newman v. Blom, 249 Iowa 836, 851, 89 N.W.2d 349, 359.

No reason appears why we should disturb this judgment.— Affirmed.

All JUSTICES concur.