H. A. BOUCHER, Lieutenant Governor of the State of Alaska, Appellant,

v.

Burton M. BOMHOFF et al., Appellees.

No. 1487.

Supreme Court of Alaska.

March 21, 1972.

John E. Havelock, Atty. Gen., Richard Garnett III, Asst. Atty. Gen., Juneau, for appellant.

Avrum M. Gross, of Faulkner, Banfield, Boochever & Doogan, James B. Bradley, of Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellees.

Before BONEY, C. J., and RABINOWITZ, CONNOR and ERWIN, JJ.

OPINION

RABINOWITZ, Justice.

In this appeal we are called upon to answer important questions pertaining to the

political rights of the citizens of Alaska. More particularly, this court must determine whether the expression of the will of the electorate was frustrated as a result of noncompliance with Alaska's constitutional provisions specifying the manner in which the question of whether there shall be a constitutional convention is to be placed before the voters. We uphold the superior court's decision that the executive officer charged wtih the legal obligation of preparing the November 1970 referendum ballot so far departed from the constitutionally prescribed form of ballot that the electorate's right to vote on the question was impermissibly infringed.

Article I, section 2, of the Alaska Constitution provides that all political power originates with the people and is "founded upon their will only." Article V, section 1, guarantees that "every citizen of the United States who is at least eighteen years of age . . . . may vote in any state or local election." Thus, it is basic to our democratic society that the people be afforded the opportunity of expressing their will on the multitudinous issues which confront them. In this regard, article XIII, section 3, of the Constitution of Alaska, provides in part that:

If during any ten-year period a constitutional convention has not been held, the lieutenant governor shall place on the ballot for the next general election the question: 'Shall there be a Constitutional Convention?'

In implementation of this provision the legislature provided in AS 15.15.030(9) that:

The general or special election ballot shall be designed with the question of whether a constitutional convention shall be called placed on the ballot in the following manner: 'Shall there be a constitutional convention?' Provision shall be made for marking the question 'Yes' or 'No.'

Despite the explicit requirement of article XIII, section 3, as to the language of the question, and specification of the form of the ballet provided for in AS 15.15.-030(9), for some unexplained reason the ballot pertaining to the constitutional convention referendum proposition was worded to read and appeared on the November 3, 1970, ballot as follows:

REFERENDUM
As required by the
Constitution of the State of Alaska
Art. XIII, Section 3
Shall there be a constitutional
convention?

YES ☐

NO ☐

At the general election held on November 3, 1970, the proposition set out above received an affirmative vote of 34,911 to 34,472. Thereafter, appellees brought suit to enjoin the calling of the constitutional convention and to require that the proposition be put to the electorate at the next general election without the prefatory language "As required by the Constitution of the State of Alaska, Art. XIII, Section 3." The basis of the appellees' complaint was that the prefatory language introduced a bias in the election because the prefatory phrase suggested that what was required by article XIII, section 3, of the constitution was the convention rather than the referendum.

In Count I of their complaint appellees asserted that the unauthorized prefatory language "constituted malconduct . . . and further perpetrated a constructive fraud upon the electorate . . . within the meaning of AS 15.20.540."[1] In the

1. This section of Alaska's Election Code provides in part:
   A defeated candidate or 10 qualified voters may contest the nomination or election of any person or the approval or rejection of any question or proposition upon one or more of the following grounds: (1) malconduct, fraud, or corruption on the part of an election official sufficient to change the result of the election . . . .

second count of this complaint, appellees asserted that the election was null and void in that appellant failed to comply with the requirements of Alaska's constitutional provision specifying the language to be employed in putting before the electorate the question of whether or not a constitutional convention should be held.

After trial to the superior court, the court held that the prefatory language contained in the ballot of November 1970 was unauthorized, had "biased the vote" and "affected the result." Paralleling the alternative theories of the complaint, the trial court further held that "[t]he wording of the proposition was misconduct and constituted fraud" within the meaning of AS 15.20.540, and that the constitutional convention referendum proposition, worded as required by article XIII, section 3, of the Alaska Constitution, had not been presented to the voters on the ballot of November 1970. Judgment was then entered enjoining appellant from calling a constitutional convention and requiring that the question "Shall there be a Constitutional Convention?" be placed on the ballot for the next general election.

Basic to the legal system in the United States of America is the doctrine that the federal constitution and the constitutions of the states of the union embody expressions of fundamental law which are reflective of the powers delegated by the people to their various governments and of rights deemed essential to a functioning democratic society. Early in this country's jurisprudence it was established that we are a government of laws, not of men, and that the task of expounding upon fundamental constitutional law and its application to disputes between various segments of government and society rests with the judicial branch of government.[2] Thus, in the case now before this court we must determine whether the wording of the referendum ballot of November 1970 complied with the fundamental law expressed in article XIII, section 3, of the Alaska Constitution.

Under the provisions of Alaska's Election Code, our legislature has authorized election contests, placed jurisdiction over such contests in the superior court, and has specified the content of the judgments which are to be entered.[3] These provisions of Alaska's Election Code are not atypical, rather they reflect the role American courts have played in the resolution of election contest issues. Numerous judicial decisions can be found where courts have determined whether ballot language was confusing.[4] Representative of these decisions is *Armstrong v. Fiscal Court*, 162 Ky. 564, 172 S.W. 972 (1915), where the court was presented with a bonding proposition that stated both the affirmative and the negative in one sentence. In that case the court observed:

The purpose of holding elections is to ascertain the public will, and it is too plain for argument that in such cases that will cannot be told from the ballots, and neither the courts nor the election authorities are authorized to arbitrarily assume that the voters meant something which cannot fairly be ascertained from the ballots themselves. 172 S.W. at 973.

Closer to the questions presented in the case at bar is *City of Newport v. Gugel*, 342 S.W.2d 517 (Ky.1960). At issue was an initiative which set minimum salaries and established working conditions for municipal firemen and policemen. During the preparation of the initiative ballot, an executive officer, acting on his own, added the title "Fair Pay Petition" to the initia-

---

2. Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803).

3. AS 15.20.540–60.

4. *See* Markus v. Trumbull County Bd. of Elections, 19 Ohio Misc. 67, 250 N.E.2d 106 (1968), aff'd, 22 Ohio St.2d 197, 259 N.E.2d 501 (1970), where the ballot title in question amplified and misrepresented a zoning initiative; Allen v. Van Winkle, 136 Or. 173, 298 P. 241 (1931), where the court found a title regarding an initiative prohibiting commercial fishing to be confusing.

tive ballot. In setting aside the initiative election, the *Gugel* court said:

> While the words 'Fair Pay Petition' are mild and not calculated to arouse violent prejudices, nevertheless it is plain that they were put on the ballot and voting machine labels for propaganda purposes and with the thought that they would in fact influence some of the voters. We are in no position to say that the words did not accomplish the desired purpose. We have twice held that such devices are unauthorized, and we do not conceive that the courts should be required to speculate as to whether an unfair election resulted from such a plain violation of the statute.
>
> . . . It is our opinion that the use of the words 'Fair Pay Petition' on the ballots and voting machine labels was such an impropriety as to invalidate the election. 342 S.W.2d at 519.

Thus it can be seen that in election contests the overriding concern of the courts has been to ascertain whether the alleged impropriety in fact establishes doubt as to the validity of the election result.

■ The determinative standard to be applied in judging any election contests in Alaska has been established by our legislature in AS 15.20.540(1).[5] In the case at bar, in order for appellees to have successfully contested the vote on the constitution-

al referendum question, they had the burden of proving

> malconduct . . . on the part of an election official sufficient to change the result of the election.

This statutory standard parallels the "directory" view that statutes prescribing election procedures and ballot forms are directory and that they therefore establish a desirable rather than a mandatory norm. Under the "mandatory" view, any deviation from the statutorily prescribed form of ballot results in a void election.[6]

Thus, in the case at bar, it was incumbent upon the appellees to show more than a lack of total and exact compliance with the constitutionally and statutorily prescribed form of ballot. Here appellees had the dual burden of showing a significant deviation from the prescribed form and that such departure was of a magnitude sufficient to change the result of the referendum election.

At trial appellees presented an expert witness who testified that in his opinion the prefatory phrase had introduced a "significant bias" into the vote on the constitutional convention proposition, and that this "bias [was directed] toward an affirmative vote." Appellees also introduced into evidence the results of a survey conducted by this expert witness as proof that the prefatory language had injected a bias towards

---

5. Appellant cites Turkington v. City of Kachemak, 380 P.2d 593 (Alaska 1963), for the proposition that an election should not be overturned unless there is proof that the outcome was affected by the failure to comply with the election laws. Appellant's argument overlooks the wording of AS 15.20.540 which requires that the misconduct must be shown to be sufficient to change the result, not that evidence be presented which shows in fact that the result of the election was changed. *Turkington* merely states that a party challenging an election has the burden of proving that the alleged misconduct *could have changed* the result of the election. In *Turkington*, we concluded that no matter what errors might be shown, the ballots affected were of a number insufficient to have an effect on the re-

sult of the election. We thus reaffirm our holding in *Turkington* that the appropriate standard in election contests is that specified in AS 15.20.540.

6. *Compare* Knappenberger v. Hughes, 377 Ill. 126, 35 N.E.2d 317 (1941); People ex rel. Woods v. Green, 265 Ill. 39, 106 N.E. 504 (1914); City of Newport v. Gugel, 342 S.W.2d 517 (Ky.1960); Horsefall v. School Dist., 143 Mo.App. 541, 128 S.W. 33 (1910); Miller v. Pennoyer, 23 Or. 364, 31 P. 830 (1893); Oncken v. Ewing, 336 Pa. 43, 8 A.2d 402 (1939); Pellegrino v. State Bd. of Elections, 100 R.I. 71, 211 A.2d 655 (1965); *and* McCoy v. Fisher, 136 W.Va. 447, 67 S.E.2d 543 (1951); *with* Walker v. Junior, 247 Ala. 342, 24 So.2d 431 (1946).

an affirmative vote. Appellant countered with his own expert witness whose testimony consisted primarily of an exposition of alleged defects in the survey which had been conducted by appellees' expert witness. However, on cross-examination appellant's expert agreed that the survey did demonstrate a bias resulting from the language employed in the prefatory phrase.

Examination of the various provisions of the Alaska Constitution reveals that our Founding Fathers went to particular pains to prescribe the precise language which was to be employed in asking the electorate to decide whether a constitutional convention should be held. The wording required by article XIII, section 3, is unique in that it is the sole instance where the Founding Fathers believed it necessary to articulate the precise language which must be used in placing a particular proposition before the voters of Alaska. Study of Alaska's 1955–56 Constitutional Convention Proceedings illuminates the purpose and intent of the Framers in adopting the particular language which subsequently became article XIII, section 3, of the Alaska Constitution.

A substantial portion of the debate surrounding the various sections of article XIII centered on the question of whether the legislature itself should be empowered to amend the constitution or whether this power should reside in the people.[7] In resolving this issue, the Framers rejected a proposal which could have permitted amendment by action of two successive legislatures and in turn decided that the ultimate power of amendment should be located in the electorate.[8] In addition, the Framers determined, in article XIII, section 2, that "[t]he legislature may call constitutional conventions at any time." At the time article XIII, section 3, was considered by the delegates to the 1955–56 convention, a proposal was made to expand the language, "Shall there be a Constitutional Convention?" in order to inform the voters that if they approved the proposition they were in effect voting for a body which was empowered to completely revise the Alaska Constitution.[9] After debate the Framers voted down the proposal to expand the propositional language and article XIII, section 3, was thereafter adopted in its present form.

It is against this background that we must determine whether the superior court correctly decided that the November 1970 ballot did not comply with the prerequisites of article XIII, section 3, of the Alaska Constitution, and that the wording used constituted misconduct sufficient to change the result of the election under the standards of AS 15.20.540 of Alaska's Election Code.

On the basis of our study of the record, we believe that a reading of the questioned ballot leads inescapably to the conclusion that the prefatory language was inherently misleading.[10] The prefatory language suggests that the constitution requires that a constitutional convention be held, when in fact it requires only that a referendum be held on the question of whether there shall be a constitutional convention. The implication of the prefatory language is that a constitutional convention will be held as required by the Alaska Constitution unless the voters reject the holding of a convention. On the basis of the foregoing analysis of the prefatory language and the opinion evidence previously alluded to which was produced by appellees, we affirm the trial court's findings of

7. 2 Alaska Const.Conv.Proc. at 1247–63.

8. *See* Committee Proposal Number 3, introduced by Committee on Direct Legislation, Initiative, Referendum and Recall, Amendment and Revision, 6 Alaska Const. Conv.Proc., App. V at 18. In regard to the note to delete the provision permitting amendment by action of two successive legislatures, see 2 Alaska Const.Conv.Proc. at 1252–53.

9. 2 Alaska Const.Conv.Proc. at 1275.

10. *See* Knappenberger v. Hughes, 377 Ill. 126, 35 N.E.2d 317 (1941) ; Turner v. Board of Educ., 266 S.W.2d 321 (Ky. 1954).

fact and conclusions of law.[11] More particularly, we hold that the trial court was correct in deciding that the inclusion, by the executive officer charged with the duty of preparing the ballot, of the prefatory language was malconduct within the intendment of AS 15.20.540(1). We further hold that the trial court was not erroneous in its holding that the unauthorized prefatory language had injected a bias into the election which was sufficient to change the result of the referendum.[12]

■ One issue remains. Appellant has challenged the propriety of the superior court's ordering a new election. The argument is based on AS 15.20.560 of Alaska's Election Code which provides in part that in an election contest:

The judge shall pronounce judgment on which candidate was elected or nominated and whether the question or proposition was accepted or rejected.

Appellant contends that under AS 15.20.560 the judge is not given the discretion to order a new election, but may only declare whether the proposition was accepted or rejected. We disagree. The courts of Alaska have the duty to uphold the Constitution of Alaska. In the context of the litigation at bar, this duty required the trial court to ensure that the question required to be presented to the electorate by article XIII, section 3, of the Alaska Constitution, be presented in the form prescribed by that provision of our constitution. Since the trial court correctly concluded that the unauthorized prefatory language injected a bias into the election which was sufficient to change the result of the election, we think the trial court was justified in concluding that the question in the language prescribed by article XIII, section 3, as to whether there should be a constitutional convention had not been submitted to the electorate. In such circumstances, we find inapposite the requirement contained in AS 15.20.560 that the court in an election contest pronounce judgment on "whether the . . . proposition was accepted or rejected." Since article XIII, section 3, requires that the matter be placed on the ballot once

11. We therefore find it unnecessary to consider any of the arguments raised by appellant concerning the survey conducted by appellees' expert witness and introduced by appellees over the objection of appellant. Any error on the part of the trial court in considering the survey is rendered harmless by virtue of our holding that a direct examination of the ballot phraseology and the opinion adduced is sufficient.

Alaska R.Civ.P. 52(a) provides in part that, in a review of a case tried without a jury, the findings of fact of the trial judge shall not be set aside unless clearly erroneous. *E. g.*, Palfy v. Rice, 473 P.2d 606, 609 (Alaska 1970) ; State v. Phillips, 470 P.2d 266, 268 (Alaska 1970) ; Ayers v. Day & Night Fuel Co., 451 P.2d 579, 582 (Alaska 1969).

12. In the case at bar, we are not confronted with unauthorized ballot language which was innocuous, rather we are presented with a situation where the unauthorized prefatory language hindered the free expression of the will of the people in a manner which was sufficient to change the result of the referendum election. The distinction between an innocuous deviation and a deviation having sufficient import to change the result of an election has long been recognized by the courts. Typical of judicial precedent which has drawn such a distinction is Knappenberger v. Hughes, 377 Ill. 126, 35 N.E.2d 317 (1941). There the court upheld an election where the unauthorized language, while accurate, was not entirely detailed as to the meaning of the proposition. The court said :

Though he [the Illinois Secretary of State] overstepped his authority in having [the additional information] placed on the ballot above the proposition to be voted on, the error was on the side of giving the voters more information and, if not stated so as to mislead them, it affords no ground for declaring the election void.

. . . Most of appellant's argument is that the statements and suggestions are not sufficiently detailed. It is true that they could have been made more enlightening by going into greater detail, but a failure to do that will not alone void the election, so long as no misleading impression is thereby given. 35 N.E.2d at 320–321.

*See* Pellegrino v. State Bd. of Elections, 100 R.I. 71, 211 A.2d 655 (1965).

every 10 years, the trial court, in order to fulfill its obligation to uphold the Constitution of Alaska, had the necessary power to fashion an appropriate remedy in order that the proposition be placed on the ballot in the next general election.[13]

In upholding the superior court's judgment, we give effect to the people's right to vote on the question of whether there shall be a constitutional convention. Our affirmance of the superior court's judgment is reflective of our constitutional mandate to see that this fundamental law is complied with and that our electorate have the opportunity to exercise their franchise as guaranteed under the Constitution of Alaska. We have no authority to interfere with the lawfully expressed will of the people. On the other hand, where the executive officer charged with the legal duty of preparing the referendum ballot in accordance with the requirement of article XIII, section 3, so far departs from the constitutionally prescribed form of ballot that the free expression of popular will was frustrated, we would be in default of our judicial office if we did not ensure that Alaska's electorate are given the opportunity to express their will in response to a ballot that is drawn in conformity with the intent of the Framers of the Constitution of Alaska.

The judgment of the superior court is affirmed.

ERWIN, Justice (concurring).

I strongly concur in the result reached by the majority and agree that the appropriate test is whether the deviation on the ballot constituted malconduct "sufficient to change the result of the election." Because of the difficulty the trial judge faces in making this determination, however, some comment should be made on the propriety of admitting expert testimony based on a poll taken of selected voters for assistance. I have concluded that such evidence is properly admitted and, in the case at bar, clearly supportive of the trial judge's decision.

Turning first to the question of the relevancy of survey evidence, it must be conceded that the utilization of mathematical and statistical techniques as an aid to the fact-finding process at trial has generated considerable controversy among legal scholars.[1] For example, Professor Tribe, writing in reaction to what he describes as a "growing and bewildering literature of praise for mathematical precision in the trial process"[2] argues that the utility of mathematical techniques at trial has been greatly exaggerated, that they inherently conflict with other important values in our system, and concludes that the "union would be more dangerous than fruitful".[3] These dangers are typified by People v. Collins, 66 Cal.Rptr. 497, 438 P.2d 33 (1968). There a couple was convicted by

13. *Compare* K & L Distributors v. Murkowski, 486 P.2d 351 (Alaska 1971); Alyeska Ski Corp. v. Holdsworth, 426 P.2d 1006 (Alaska 1967).

We recognize that a case may arise in which an election or referendum not required by the constitution is challenged because of errors or misleading language on the ballot. In such a case, it might be possible to argue that the misleading language so frustrated the free exercise of the public will as to be violative of due process. We express no opinion here as to whether the trial judge could properly order a new election in such a case.

1. In praise of mathematical techniques, *see, e. g.,* Cullison, Probability Analysis of Judicial Fact-finding: A Preliminary Outline of the Subjective Approach, 1969

U.Tol.L.Rev. 538 (1969); Finkelstein & Fairley, A Bayesian Approach to Identification Evidence, 83 Harv.L.Rev. 489 (1970). Substantial reservations are expressed in Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv.L.Rev. 1329 (1971). *See also,* Becker, Crime and Punishment: An Economic Approach, 76 J.Pol.Econ., 169 (1968); Birmingham, A Model of Criminal Process: Game Theory and Law, 56 Cornell L.Rev. 57 (1970); Kaplan, Decision Theory and the Factfinding Process, 20 Stan.L.Rev. 1065 (1968).

2. Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv. L.Rev. 1329, 1332 (1971).

3. *Id.* at 1393.

a jury after an expert mathematician testified that if the robbery were indeed committed by a Caucasian woman with a blond pony tail accompanied by a Negro with a beard and moustache driving a yellow car as several witnesses testified, there was only one chance in twelve million that the defendants, who possessed those same characteristics, were innocent. The California Supreme Court reversed their convictions, and noted that "[m]athematics, a veritable sorcerer in our computerized society, while assisting the trier of fact in a search for truth, must not [be allowed to] cast a spell over him." 66 Cal.Rptr. 497, 438 P.2d 33.

To be contrasted to the *Collins* situation, where probability theory was used to prove a fact not susceptible to quantitative analysis, is the case where the governing substantive law turns on a question that is in some sense mathematical. In such a case there is general agreement that the use of mathematical and statistical techniques is proper.[4] Thus, quantitative methods have been utilized in cases hinging on percentage of market control,[5] expected lifetime earnings,[6] the randomness of the jury selection process,[7] and widespread public confusion over similar trademarks.[8] In the case at bar, not only was the poll highly relevant, but, as the state concedes, an expert-conducted poll is really the only satisfactory objective evidence available to assist the trial judge in deciding whether the error on the ballot was sufficient to change the result of the election. Applying the test we announced in Leavitt v. Gillaspie, 443 P.2d 61, 70 (Alaska 1968), that we would permit expert testimony if the trier of fact "can receive appreciable help from the expert witness on the subject on which he testifies," I think that the trial court correctly decided that the poll was relevant.

Appellant also argues that admission of the poll violated the rule against admission of hearsay evidence.[9] The more persuasive authority and the concensus of legal writers, however, is that the hearsay rule should not bar introduction of survey evidence.[10] Several grounds have been suggested for this conclusion. First, the out-of-court statement often is not offered to prove the truth of the matter stated, and in such a case does not fall within the clas-

4. *See id.* at 1338. Regarding the use of survey evidence in particular, *see* H. Barksdale, The Use of Survey Research Findings as Legal Evidence (1957); Sorenson & Sorenson, The Admissibility and Use of Opinion Research Evidence, 28 N.Y.U.L.Rev. 1213 (1953); Zeisel, The Uniqueness of Survey Evidence, 45 Cornell L.Q. 322 (1960).

5. *E. g.*, United States v. United Shoe Mach. Corp., 110 F.Supp. 295, 304–305 (D.Mass. 1953) (Wyzanski, J.), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

6. *See, e. g.*, Louisville & N. R. R. v. Steel, 257 Ala. 474, 59 So.2d 664 (1952); Von Tersch v. Ahrendsen, 251 Iowa 115, 99 N.W.2d 287 (1959); Leavitt v. Gillaspie, 443 P.2d 61, 70 (Alaska 1968).

7. *See, e. g.*, Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967). *See generally* Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv.L.Rev. 338 (1966); Zeisel, Dr. Spock and the Case of the Vanishing Women Jurors, 37 U. Chi.L.Rev. 1 (1969).

8. *E. g.*, United States v. 88 Cases, More or Less, Containing Bierley's Orange Beverage, 187 F.2d 967, 974 (3d Cir.), cert. denied 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1951); Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 680–686 (S.D.N.Y.1963) (Feinberg, J.).

9. Under a stipulation between the parties, all objections to the hearsay nature of the poll, "with the exception of possible hearsay objections over the absence of the individuals whose opinions were solicited" were waived. Thus, we can limit our attention to the out-of-court statements of interviewees; no "double hearsay" problems remain.

10. *See* 6 Wigmore, Evidence § 1704 at 15 (Supp.1970); Zeisel, The Uniqueness of Survey Evidence, 45 Cornell L.Q. 322, 333–337 (1960); H. Barksdale, The Use of Survey Research Findings as Legal Evidence, 39–41 (1957).

sic definition of hearsay.[11] Second, even if it is regarded as hearsay, it is admissible under the recognized exception to the hearsay rule for declarations of present attitude, belief or state of mind.[12] Third, it has been suggested that since surveys satisfy the rationale for the other exceptions to the hearsay rule, namely, necessity and trustworthiness,[13] a special exception for survey evidence should be recognized.[14]

Finally, appellant argues that because of a number of defects in Dr. DeVries' poll it should be accorded no probative weight. Briefly, Dr. DeVries, a professor of political science at the University of Michigan and an acknowledged expert in election and political polling, proceeded as follows: Two Anchorage area precincts were selected as "weather vane" precincts because the percentage vote on the referendum there approximated the percentage vote in the state as a whole, and because the precincts had tended to reflect the outcome of the last several statewide elections.[15] One hundred and fifty voters who had participated in the last election were selected at random from each precinct and each voter was asked four questions. The questions asked were: (1) Should the people of Alaska vote on the question of land claims? (2) Should

there be a reform of the Alaska Court System? (3) Should the people of Alaska vote on the question of reapportionment of the legislature? (4) Should there be a constitutional convention? In one precinct each question was prefaced by the phrase "as required by the Constitution of the State of Alaska"; in the other precincts they were not. As Dr. DeVries explained, the result was that an affirmative bias, ranging from eight percent to thirty-four percent, was found to have been introduced by the prefatory phrase "as required by the Constitution of the State of Alaska." On the constitutional convention question, the affirmative bias was 14.7 percent. Dr. DeVries testified that in his opinion the prefatory language introduced a significant bias towards an affirmative vote and changed the result of the November referendum.

Clearly no reversible error occurred in admitting this poll. Even if I were persuaded by appellant's criticisms of the poll,[16] it would be difficult to conclude that the trial judge could not competently weigh the evidence without being prejudiced. This is to say that within fairly broad limits, and especially in a judge-tried case, any defects in the poll should go to its weight and not its admissibility.[17] We

---

11. *See* United States v. 88 Cases, More or Less, Containing Bierley's Orange Beverage, 187 F.2d 967, 974 (3d Cir.), cert. denied 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1951).

12. *See* Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 682 (S.D.N.Y. 1963) and cases cited therein.

13. *See* 5 Wigmore, Evidence §§ 1420–1422 at 202–205 (1940).

14. Zeisel, The Uniqueness of Survey Evidence, 45 Cornell L.Q. 322, 345–346 (1960). *See also* Zippo Mfg. Co. v. Rogers Imports. Inc., 216 F.Supp. 670, 683–684 (S.D.N.Y.1963).

15. Dr. DeVries developed the statistical weather vane concept in 1962. It is based on the premise that certain precincts tend to vote consistently like the electorate in an entire state through time. He testified that he had had a near 100% success record using this technique in the recent past.

16. Appellant asserts that there were nine major defects in Dr. DeVries' poll. (1) Dr. DeVries' "survey" was in fact an "experiment". (2) Conditions had substantially changed between the time of the election and the time of the survey. (3) Several of these differences could have been avoided. (4) Only the final tabulations of the survey were put into evidence. (5) The survey was offered for a purpose different from that for which it was designed. (6) The interviewers were poorly supervised. (7) The sampling technique used by Dr. DeVries was inadequate. (8) The sample was drawn from a population which was not representative of the universe. (9) The study was prepared for the purpose of litigation.

17. *See* Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 681 (S.D.N.Y. 1963).

have adopted liberal rules in Alaska regarding the admission of expert testimony [18] and I see no reason to cut back in cases where the expert's testimony is based on a poll. Appellant cross-examined Dr. DeVries in considerable detail at trial and presented its own expert witness who gave his opinion about certain defects in Dr. DeVries' poll. Cross-examination and the opportunity to present rebutting expert testimony provide adequate protection against any errors in the poll or in the expert's testimony.[19] These considerations are particularly persuasive under the facts of this case where, as indicated above, survey evidence is the only objective evidence available.[20]

18. *See* Leavitt v. Gillaspie, 443 P.2d 61, 70 (Alaska 1968). *Cf.* Dash v. State, 491 P.2d 1069 (Alaska 1971).

19. See Zeisel, The Uniqueness of Survey Evidence, 45 Cornell L.Q. 322, 340–344 (1960) for a discussion of how a survey can be impeached by showing either that the survey was directed at a universe which was irrelevant to the litigated issue, that the sample taken was inadequate, or that there were circumstances existing in the interviews which diminished the reliability of the survey. In order to give opposing counsel a reasonable opportunity to effectively cross-examine the expert witness, he should, of course, be notified prior to trial that a survey will be used.

20. The presumption of validity given to elections and the diffidence with which the court attacks the results thereof places a heavy burden on a trial judge. Any aid which he can obtain in reviewing largely subjective matters is greatly to be preferred over other methods which are closer to personal preference than legal authorities readily care to admit.