Daniel DeNARDO and Deborah
Luper, Appellants,

v.

MUNICIPALITY OF ANCHORAGE
and Neighbors for Mark
Begich, Appellees.

No. S–11128.

Supreme Court of Alaska.

Jan. 14, 2005.

Daniel DeNardo, pro se, Appellant, Anchorage.

Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Appellant Luper.

Frederick H. Boness, Municipal Attorney, Anchorage, for Appellee Municipality of Anchorage.

Jeffrey M. Feldman, Susan Orlansky, and Julie Rikelman, Feldman & Orlansky, Anchorage, for Appellee Neighbors for Mark Begich.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

OPINION

FABE, Justice.

# I. INTRODUCTION

The appellants in this case challenge the order in which the candidates' names were placed on the ballot in the 2003 Anchorage mayoral election. They also seek to undo the passage of an amendment to the Anchorage Municipal Charter due to alleged procedural defects. We affirm the superior court's grant of summary judgment to the appellees on all grounds.

# II. FACTS AND PROCEEDINGS

## A. Facts

On April 1, 2003, the Municipality of Anchorage held a general election. The election included races for mayor and three school board seats. The ballot listed Mark Begich first among the mayoral candidates. The election also submitted four propositions to the voters for approval, including the one at issue in this case, Proposition 2. Proposition 2 was a charter amendment limiting run-off elections to mayoral elections where no mayoral candidate receives more than 45% of the vote. Before Proposition 2 was adopted, run-off elections in mayoral, school board, and assembly races were required when no candidate received more than 50% of the vote.

### 1. Random selection of candidate placement on ballots

Before 1996 the Municipality used a rotational system for placement of candidate names on ballots. In 1996 the Municipality changed to a system where a random process determines a fixed order for placement of candidate names. In the April 2003 Anchorage mayoral election, candidate Mark Begich occupied the first position. Begich won the election, receiving 45.03% of the vote.

### 2. Proposition 2

The initial version of Proposition 2, an ordinance referred to as AO 2002–79, provided that run-off elections would take place only in mayoral elections where no candidate received more than 50% of the vote. The Anchorage Assembly held a meeting on June 25, 2002, where many members of the public spoke about AO 2002–79. The assembly then submitted a revised version of AO 2002–79 providing for run-off elections where no mayoral candidate received more than 45% of the vote. Like the initial version, the revised version repealed the requirement of run-off elections for other positions. On July 7 and July 14, 2002, the assembly published two notices in the *Alaska Journal of Commerce* regarding the revised version, AO 2002–79(S). The notices informed the public that a public hearing would take place on July 16. The notices described the proposition as permitting a mayoral candidate to be elected with 45% of the vote without a run-off election. At the July 16 public hearing, many individuals testified for and against the ordinance; the chairman limited testimony to those who had not testified on the issue at the June 25 hearing.

After the assembly passed the ordinance, the Municipality placed Proposition 2 on the ballot. A notice appeared in the *Anchorage Daily News* on February 15, 2003. The notice ran again on March 31, 2003, the day before the election. After the first notice, there was significant public discussion regarding Proposition 2's effective date and the 45% requirement. Some citizen groups urged voters to reject the measure and the *Anchorage Daily News* featured articles and op-ed pieces discussing the impact of Proposition 2.

### 3. Election results

Proposition 2 passed with 54.99% of voters approving it. Mark Begich was elected mayor, receiving 45.03% of the vote. Begich's closest competitor, George Wuerch, received 37.18% of the vote. Begich was sworn in as mayor on July 1, 2003.

## B. Proceedings

Daniel DeNardo filed a pro se complaint against the Municipality of Anchorage in superior court on April 15, 2003 challenging the passage of Proposition 2. Approximately two weeks later, Deborah Luper and Rinna Merculieff (Luper) intervened as plaintiffs, alleging that Proposition 2 was invalid and that

fixing the order of the candidates' names on the ballot was improper. Neighbors for Mark Begich (Neighbors) intervened as a defendant. The parties filed cross-motions for summary judgment.

The superior court issued an order granting summary judgment to the Municipality and Neighbors on the basis that no significant deviation from the law occurred that could have affected the election's results. The court entered its final order on July 3, 2003. This appeal followed.

## III. DISCUSSION

### A. Standard of Review

 This court reviews a grant of summary judgment de novo, drawing all reasonable inferences in favor of the nonmoving party.[1] We uphold a grant of summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[2] We apply our independent judgment to legal and statutory interpretation issues.[3]

### B. Random Selection of Candidate Order on the Ballot Is Constitutional Under *Sonneman.*

 DeNardo and Luper argue that the mayoral election was biased and unfair due to "positional bias" created by the fixed position of the candidates' names on the ballot. They also argue that this court's holding in *Sonneman v. State,*[4] that positional bias does not impermissibly burden the right to vote, does not control this case. We disagree. This case is controlled by *Sonneman,* and we therefore hold that the placement of the candidates' names on the ballot was constitutional.

In *Sonneman,* we considered whether ending the practice of rotating the order of candidates' names on state election ballots and replacing it with a random determination of the fixed order of candidates' names was constitutional.[5] We examined "whether the legislature is required to use the fairest method, or whether a reasonable, nondiscriminatory method is sufficient."[6] We emphasized the important regulatory interests of reducing costs and preventing voter confusion and then concluded that those interests justify the minimal burden on the right to vote imposed by the random selection of the first candidate.[7] Although we recognized the possibility that fixed placement of candidates' names could result in a positional bias of 5–7%, we held that random selection of fixed ballot positions was nonetheless constitutional.[8]

While DeNardo and Luper acknowledge that *Sonneman* permits random selection of ballot positions in state primary elections, they argue that the factors for the April 2003 mayoral election were so different that *Sonneman* should not control. They first emphasize that the 5% positional bias did not actually affect the *Sonneman* election because the difference in votes received between the first and second place finishers in that case was substantially more than 5%. Next, DeNardo and Luper focus on the fact that Begich achieved a 45% plurality by only seventeen votes, alleging that Begich's position on the ballot resulted in his victory.

We do not find this argument persuasive. In *Sonneman,* we explicitly considered the possibility that positional bias could determine the outcome of Alaska elections. We noted that even if we accepted as true that positional bias affects 5–7% of the votes cast and that Alaska elections are often decided by margins of less than 5%, the burden placed by random selection on the right to

1. *Nichols v. State Farm Fire & Cas. Co.,* 6 P.3d 300, 303 (Alaska 2000); *Moore v. Allstate Ins. Co.,* 995 P.2d 231, 233 (Alaska 2000).

2. *K & K Recycling, Inc. v. Alaska Gold, Co.,* 80 P.3d 702, 711 (Alaska 2003).

3. *Cook Inlet Keeper v. State,* 46 P.3d 957, 961 (Alaska 2002).

4. 969 P.2d 632, 641 (Alaska 1998).

5. *Id.* at 634.

6. *Id.* at 639.

7. *Id.* at 640.

8. *Id.* at 639 n. 7.

vote is reasonable.[9]

DeNardo and Luper also focus on our statement in *Sonneman* that we would not address "whether the effects of positional bias could necessitate a stricter review if it affected a greater percentage of the votes." [10] They argue that a "greater percentage of the votes was affected in the Anchorage election than in the state election," and that "the entire election was determined by positional bias." This interpretation is mistaken. In *Sonneman*, we assumed a 5–7% bias,[11] while DeNardo and Luper claim only a 4–5% bias in elections generally. Thus, DeNardo and Luper allege that a smaller percentage of the vote is affected by positional bias than the percentage we deemed permissible in *Sonneman*.

DeNardo and Luper also argue that *Sonneman* is distinguishable because it resulted in a majority winner and dealt with a primary election. However, we never suggested that our holding in *Sonneman* would be limited to primary elections or to elections where the winner receives a majority of the votes.[12] Because *Sonneman* governs this case, we hold that the random selection of fixed positions for the candidates' names did not impermissibly burden the right to vote in the 2003 mayoral election.

### C. There Was No Significant Deviation from the Law Associated with Proposition 2.

DeNardo and Luper contend that Proposition 2 was presented to the voters in a biased and confusing manner. We address this claim in three parts. First, we conclude that this is an election contest. Next, we explain that it is subject to a higher standard of review because it is an election contest. Finally, we apply the higher standard of review and conclude that there was no significant deviation from the law sufficient to warrant upsetting the election results.

### 1. This is an election contest.

■■■■ In the past we have drawn a distinction between pre-election challenges to ballot initiative language and post-election challenges seeking to overturn election results.[13] The standard for post-election contests is higher than that for pre-election challenges.[14] The different standards serve the important purpose of discouraging parties from mounting post-election challenges just because they are displeased with the results of a given election.

In *Walleri v. City of Fairbanks*, we explained that "[w]hether a cause of action should be deemed an election contest . . . turns on the remedy sought. If granting the remedy would defeat the public interest in the stability and finality of election results, it is appropriate to deem the cause of action an election contest and to require compliance with the procedures for such contests." [15] DeNardo and Luper seek to void Proposition 2, a remedy that would both overturn the proposition and mandate a runoff in the mayoral election. Because their proposed remedy implicates the public interest in the stability and finality of election results, we conclude that this is an election contest.

DeNardo and Luper claim that it is not an election contest, citing the superior court's conclusion that they did not need to exhaust their administrative remedies. But they are mistaken. The superior court, in deciding that judicial review was not precluded for failure to comply with election contest procedures, emphasized that the challenge was justiciable "wholly apart from the election itself" and that the Municipality asserted at oral argument that "exhaustion of adminis-

---

9. *Id.*

10. *Id.*

11. *Id.*

12. *See id.* at 636–40.

13. *Compare Alaskans for Efficient Gov't, Inc. v. State*, 52 P.3d 732, 735 (Alaska 2002) (holding that petition summary language must be impartial in a pre-election challenge) *with Boucher v.*

*Bomhoff*, 495 P.2d 77, 80 (Alaska 1972) (requiring post-election challengers to demonstrate malconduct on the part of election officials sufficient to change election results).

14. *See Alaskans for Efficient Gov't*, 52 P.3d at 735; *Boucher*, 495 P.2d at 80.

15. 964 P.2d 463, 466 (Alaska 1998).

trative remedies is not a condition precedent to judicial review."[16] The superior court's relaxation of the exhaustion requirement does not answer the question whether a claim is an election contest subject to the stricter standard of review.

DeNardo and Luper also urge us to apply the standard set forth in *Alaskans for Efficient Government,* a case in which we struck down the state's proposed summary for a ballot initiative because it was inaccurate and potentially misleading.[17] But *Alaskans for Efficient Government* involved a pre-election challenge to the ballot language. This case resembles *Boucher,* where we reviewed the prefatory language of a referendum post-election and applied the higher post-election standard requiring proof of malconduct on the part of an election official sufficient to change the result of the election.[18]

Because DeNardo and Luper seek to overturn the results of the election, we conclude that their challenge is an election contest.

## 2. The standard of review for election contests is higher than that for pre-election contests.

■ We apply a higher standard of review for post-election challenges to ballot language than we apply to pre-election challenges. The standard for pre-election challenges, which we applied in *Alaskans for Efficient Government,* requires that a ballot summary be impartial and accurate.[19] In contrast, the standard for post-election contests is set forth in section 28.100.010 of the Anchorage Municipal Code:

A candidate or ten qualified voters may contest the election of any person or the approval or rejection of any question or

proposition upon one or more of the following grounds:

1. Malconduct, fraud or corruption on the part of an election official sufficient to change the result of the election.

This standard is identical to the standard contained in the Alaska statute governing election contests, AS 15.20.540.[20] We construed AS 15.20.540 in *Boucher,* where we cautioned that persons seeking to contest an election must "show more than a lack of total and exact compliance with the constitutionally and statutorily prescribed form of ballot."[21] In *Boucher,* we defined malconduct as behavior resulting in "a significant deviation from the prescribed form ... of a magnitude sufficient to change the result of the ... election."[22] Therefore, DeNardo and Luper must satisfy the dual burden of showing that "there was both a significant deviation from statutory direction, and that the deviation was of a magnitude sufficient to change the result of the election."[23]

## 3. DeNardo and Luper have not demonstrated a significant deviation from the statutory directive sufficient to change the result of the election.

DeNardo and Luper assert that the title of Proposition 2 as it appeared on the ballot contained four specific defects that changed the outcome of the election. They argue that (1) the title failed to provide notice of its effective date; (2) the title's reference to reducing costs was biased; (3) the title failed to make clear that the proposition would eliminate the majority vote requirement; and (4) the title failed to inform voters that the proposition would eliminate run-off require-

**16.** We need not address the correctness of the superior court's resolution of the exhaustion issue because neither party has raised it on appeal.

**17.** 52 P.3d at 737.

**18.** 495 P.2d at 80.

**19.** 52 P.3d at 735 (applying the standard to a ballot summary submitted by the lieutenant governor).

**20.** AS 15.20.540 states: "A defeated candidate or 10 qualified voters may contest the nomination or election of any person or the approval or

rejection of any question or proposition upon ... malconduct, fraud, or corruption on the part of an election official sufficient to change the result of the election."

**21.** 495 P.2d at 80.

**22.** *Id.*

**23.** *Dansereau v. Ulmer,* 903 P.2d 555, 559 (Alaska 1995).

ments for school board and assembly members. The superior court rejected all of these claims, concluding that DeNardo and Luper failed to demonstrate a significant deviation or "creat[e] a factual issue regarding likely alteration of electoral outcome."

Proposition 2's title read:

*CHARTER AMENDMENT—REPEALING AND REENACTING CHARTER SECTION 11.02(b) TO REQUIRE RUN OFF ELECTIONS ONLY FOR OFFICE OF THE MAYOR, THEREBY REDUCING THE COSTS OF RUN OFF ELECTIONS*

We now address each claim in turn.

### a. Notice of effective date

■ DeNardo and Luper first assert that the title was defective because it failed to notify voters that the proposition would become effective for the election in which it appeared. Ballot requirements for municipal elections differ significantly from ballot requirements for state elections. Unlike state law, which requires that ballots in state elections contain only a title and summary of the proposition,[24] the Anchorage Charter requires ballot propositions for charter amendments to include both the current charter wording proposed to be changed and the proposed new wording.[25] The Anchorage Municipal Code does not require a summary of the proposition, and the proposition title need only be informative, not comprehensive.[26] The Anchorage Charter assumes that the proposition language itself will inform the voters about its content. Here, the text of Proposition 2 stated that the proposition would be effective for the April 1, 2003 elec-

tion if approved. This language was included on the ballot, and nothing in the Anchorage Charter or the Anchorage Municipal Code required the language to be included in the title as well.

DeNardo and Luper also contend that the text of the proposition regarding the effective date was confusing. The text of the proposition read in part: "If approved by the voters on the April 1, 2003 Regular Election, this proposition will be effective for this election." This language made clear to voters that the proposition would be effective for the April 1 election.[27] Because a title need not be comprehensive and because the text stated the effective date, DeNardo and Luper did not meet the high burden of demonstrating a deviation from the law that affected the election outcome.

### b. Reference to reducing costs

■ DeNardo and Luper next claim that the title's reference to reducing costs is a "blatant political statement which biased the proposition in favor of an affirmative vote." They point to our decision in *Alaskans for Efficient Government,* in which we invalidated the lieutenant governor's ballot summary for a proposed initiative because it was potentially partisan and one-sided.[28] But it is not necessary to decide whether the cost-reduction language in the title for Proposition 2 was one-sided in violation of the standard set forth in *Alaskans for Efficient Government,* for that standard does not govern this case; *Alaskans for Efficient Government* dealt with a pre-election challenge.[29] Because this is a post-election challenge, we

---

24. AS 15.45.180.

25. Anchorage Charter § 18.03.

26. AMC 28.40.010(D) states: "[b]allots for propositions to be voted on shall contain only the question posed by the proposition without explanation preceded by an objectively stated, informative caption or title for the proposition." This provision was amended effective June 1, 2003, to require a summary description of propositions when the election is conducted using optical scanning equipment. The full text of the proposition must then be included on a separate explanatory ballot. AMC 28.40.010(G).

27. Voters also benefitted from pre-election publicity about the election, including articles in the *Anchorage Daily News,* League of Women Voters pamphlets, and a mailing from Alaskans for Responsible Government, all of which pointed out that the proposition would take effect immediately.

28. 52 P.3d at 736–37.

29. *Id.* at 732–33.

analyze whether the language rose to the level of malconduct effecting a deviation from the law of a magnitude sufficient to change the result of the election.

In *Boucher*, we invalidated election results because the ballot language implied that voters were required by the state constitution to pass the proposition at issue.[30] But in *Boucher*, we determined that "the unauthorized prefatory language [on the ballot] hindered the free expression of the will of the people in a manner which was sufficient to change the result of the referendum election." [31] Here, we cannot say that the ballot language hindered the free expression of the will of the people so as to change the election results. In *Burgess v. Alaska Lieutenant Governor Terry Miller*, we observed that statements about a bill's proposed effect do not introduce bias into the vote as long as the statements are accurate.[32] As the superior court determined, it is reasonable to conclude that fewer run-off elections will in fact save money. We find that the reference to "reducing costs" did not rise to the level of malconduct affecting the outcome of the election.

### c. Majority vote requirement

■ DeNardo and Luper also assert that the title was defective for failing to state that Proposition 2 would change the charter to allow candidates to be elected by 45% of the vote, rather than 50%. Again, municipal law requires only that proposition titles be objectively stated and informative, not comprehensive.[33] The ballot displayed both the text of the former statute and the text of the proposed proposition, as required by the Anchorage Charter.[34] While the title could have made the content of the proposed charter amendment more clear, the ballot contained everything required by the Anchorage Charter and the Anchorage Municipal Code.

30. 495 P.2d at 81.

31. *Id.* at 82 n. 12.

32. 654 P.2d 273, 276 (Alaska 1982).

33. AMC 28.40.010(D).

We find that failure to highlight the change in percentage did not amount to malconduct.

### d. Elimination · of run-off for school board and assembly elections

■ Finally, DeNardo and Luper contend that the title was defective because it failed to state that the proposition would eliminate run-off elections for school board and assembly elections. The title stated that it would "require run off elections only for office of the mayor." The superior court rejected the appellants' suggestion that the title should have expressly stated that it eliminated run-off elections in school board and assembly elections, characterizing this claim as "exceedingly weak even in a pre-election challenge."

Again, we analyze this claim under the stringent post-election standard set forth in AMC 28.100.010 and in *Boucher*.[35] We do not agree with the superior court that the claim would necessarily be weak in the context of a pre-election challenge. In order to comprehend that there would no longer be run-off elections for school board and assembly elections, voters were required to compare the text of Proposition 2 with the text of the charter provision then in effect. Voters would have benefitted from an explanation of this change in the title. But the deficiencies in the title do not rise to the level of malconduct. As discussed above, the Anchorage Municipal Code does not require proposition titles to be comprehensive.[36] Both the text of Proposition 2 and the text of the charter as it then stood were included on the ballot, and voters had the ability to discern the full effect of the proposition by comparing the language of the two provisions. Because this omission did not amount to a significant deviation from statutory direction sufficient to change the outcome of the election, we decline to reverse the results of the election.

34. Anchorage Charter § 18.03.

35. 495 P.2d at 80.

36. AMC 28.40.010(D).

### D. The Municipality Provided Adequate Notice and Opportunity for Hearing Regarding Proposition 2.

■ DeNardo and Luper contend that the Municipality did not follow public notice and hearing requirements for the adoption of Proposition 2. The Anchorage Charter requires public notice and a hearing for the introduction and enactment of ordinances.[37]

The initial version of Proposition 2, then listed as Anchorage Ordinance 2002-79, provided that run-off elections would take place only in mayoral elections where no candidate received more than 50% of the vote. The assembly held a meeting on AO 2002-79 on June 25, 2002, with many members of the public speaking on the issue. The Municipality issued a revised version of AO 2002-79, called AO 2002-79(S), and ran notices in the *Alaska Journal of Commerce* on July 7 and 14, 2002. The notices informed the public that a hearing would be held on July 16. The notices described the proposition as permitting a mayoral candidate to be elected with 45% of the vote without a run-off election. At the July 16 public hearing, the chairman limited testimony to those who had not testified on the issue at the June 25 hearing.

Luper and DeNardo argue that limiting testimony at the second hearing to persons who did not testify at the first hearing violated the notice and hearing requirements contained in the Anchorage Charter. The superior court rejected this argument, concluding that the limitation on testimony at the second hearing was a *"de minimis* imposition on the public hearing process, and was not a significant enough deviation from proper practice, standing alone, to vitiate the election." We agree. While the preferred practice may have been to allow limited testimony on the proposed change to the ordinance at the second hearing, the record demonstrates that Luper's attorney did in fact testify at both hearings.[38] Therefore, it does not appear that the policy was strictly enforced, and in any event it did not amount to malconduct on the part of municipal officials. We conclude that the Municipality provided adequate public notice and that the assembly's decision to limit testimony at the second public hearing was not a significant deviation from the law.[39]

### E. The Anchorage Charter Did Not Require a Three-Fifths Majority Vote To Pass Proposition 2.

■ DeNardo and Luper claim that Proposition 2 "diminishes civil rights, voting rights, and rights of political association" such that a 60% majority is required to pass under Anchorage Charter section 18.01. Section 18.01 of the Anchorage Charter provides:

Vote Required.

This Charter may be amended only upon the concurrence of a majority of the qualified voters of Anchorage voting on a proposed amendment, except that a proposed amendment which would diminish any right referred to in article II or any provision of Section 16.02 requires approval by three-fifths of the qualified voters voting on the amendment.

---

37. Section 10.01 of the Anchorage Charter provides in relevant part:

(b) ... Following introduction and upon approval of three assemblymen, the clerk shall publish a notice containing the text of the ordinance or an informative summary of its contents, the time and place for a public hearing on the ordinance, and the time and place where copies of the ordinance are available. The public hearing shall be held at least seven days after publication of the notice.

38. Kenneth Jacobus, an attorney for Luper, spoke at the June 25, 2002 assembly meeting and again at the July 16, 2002 hearing. At the July 16 hearing, Jacobus said, "I think you know my position in favor of instant run off voting as being the best solution for Anchorage. But I am just going to address this plurality thing, should it be forty percent? Forty-five percent? Or twenty-five? ..." Jacobus went on to state his belief that without a majority requirement, one voter could decide the entire election.

39. DeNardo and Luper also contend that public notice was inadequate because the title of the adopted ordinance conflicted with the text of the adopted ordinance. The title of the ordinance stated that 50% of the vote would be required to avoid a run-off election, while the amended text only required 45%. DeNardo and Luper argue that AO 2002-79 was not validly adopted and Proposition 2 was not validly placed on the ballot, preventing Proposition 2 from being validly enacted. Again, this oversight did not amount to a significant deviation from the law.

The superior court concluded that the 60% supermajority requirement did not apply to this election because the requirement only applies to the diminishment of one of the thirteen enumerated rights in article II.[40] We agree. Article II of the Anchorage Charter guarantees rights to the people of Anchorage in addition to the rights guaranteed under the United States and Alaska Constitutions.[41] None of the thirteen enumerated rights relates to the voting rights at issue in this case.[42] Moreover, as the superior court concluded, if Proposition 2 truly diminished rights protected by the federal and state constitutions, as DeNardo and Luper claim, the Municipality could not enact the proposition by any percentage of the vote. Because the supermajority requirement delineated in section 18.01 of the Anchorage Charter refers to the thirteen rights enumerated in article II of the Anchorage Charter, we find that a majority vote was appropriate.[43]

## IV. CONCLUSION

We conclude that random selection of a fixed candidate order on the ballot did not impermissibly burden the right to vote in the 2003 mayoral election. We also conclude that there was no significant deviation from the law that affected the election outcome. We therefore AFFIRM the superior court's grant of summary judgment to the Municipality and Neighbors.

---

40. Anchorage Charter article II.

41. *Id.*

42. Section 16.02 of the Anchorage Charter, which deals with utilities, is also not at issue in this case.

43. The Municipality and Neighbors argue that section 18.01 of the Anchorage Charter violates article X, section 9 of the Alaska State Constitution to the extent that it requires a supermajority to amend any part of the charter. Because the supermajority requirement in section 18.01 only applies to the thirteen enumerated rights in Anchorage Charter article II, we do not reach this question.