**STATE of Iowa, Appellee,**

v.

**Dexter HUGHES, Appellant.**

No. 88–1716.

Court of Appeals of Iowa.

March 27, 1990.

---

William L. Wegman, State Appellate Defender, and James F. Whalen, Asst. State Appellate Defender, for appellant.

Thomas J. Miller, Atty. Gen., Roxann M. Ryan, Asst. Atty. Gen., James M. Metcalf, County Atty., and Thomas J. Ferguson, Asst. County Atty., for appellee.

Heard by DONIELSON, P.J., and SACKETT and HABHAB, JJ.

HABHAB, Judge.

Defendant Dexter Hughes appeals from his conviction, following a bench trial, of first-degree murder. Defendant raises two issues on appeal: (1) whether the trial court erred in admitting evidence of past instances of child abuse committed by defendant; and (2) whether the trial court erred in its determination that felony child endangerment could serve as the underlying felony for felony murder. We affirm.

On Labor Day, 1987, defendant left Mississippi with his girlfriend, Lisa Jennings, and his eight-month-old son, Devrick Jennings, and drove to St. Louis, where they intended to reside. However, almost immediately after their arrival in St. Louis, defendant decided to drive to Chicago, where his mother lived. While in Chicago, defendant saw his brother, Richard Brown. Brown was visiting Chicago from Waterloo. Defendant then decided to drive to Waterloo. Defendant, Jennings, and Devrick arrived in Waterloo the day after Labor Day. Jennings and Devrick stayed at the apartment of defendant's brother's girlfriend, Shirley Pickett, and defendant was housed by other relatives.

Soon after their arrival in Waterloo, Devrick developed a fever and diarrhea, which necessitated his being brought to the emergency room at Covenant Medical Center on both September 15 and 23. On September 25, 1987, Devrick was examined by Dr. Templemire and found to be suffering from a minor ear infection and fever. Other than those maladies, Devrick was in good health. After the examination, Jennings and Pickett stopped to have a prescription for Devrick filled and then returned to Pickett's apartment.

When they arrived at Pickett's apartment, Jennings took Devrick into a bedroom and gave him a dose of the prescription medicine, after which Jennings bottle fed Devrick. It was at this point, while Jennings was in the process of feeding Devrick, that defendant returned to the apartment. Jennings laid Devrick down for a nap, but Devrick soon thereafter started to cry. Jennings asked defendant to check on Devrick. Defendant entered the bedroom for a brief time, and Devrick quieted down. Defendant then exited the bedroom, but he had no more than stepped out when Devrick resumed crying. Defendant reentered the bedroom and, after one to two minutes, called for Jennings. Upon entering the bedroom, Jennings observed Devrick lying in a fetal position on a pallet of blankets on the floor of the bedroom. Defendant picked Devrick up and shook him, but Devrick was unresponsive. Devrick was then rushed to the emergency room at Covenant Medical Center and subsequently was transferred to University Hospitals in Iowa City, where he died.

Dr. Templemire testified at trial that she diagnosed Devrick to be the victim of shaken baby syndrome. Medical personnel from University Hospitals concurred with Dr. Templemire's diagnosis.

Dr. Randall C. Alexander was called as a witness for the prosecution. When he diagnosed the cause of Devrick's death as shaken baby syndrome, he ruled out the possibility of accidental death. During the course of his testimony, he described shaken baby syndrome, or shaken infant whiplash syndrome, as follows:

It's a condition that can occur in older people, tends to occur mostly in children under two years of age, often under one year of age in part because what the mechanism of injury is is to hold a child and shake them back and forth repeatedly which then will result in retinal hemorrhages, bleeding in the back of the eyes and bleeding within the brain most commonly actually just outside the brain between the brain and the skull itself.

The reason it happens in the younger children is a fairly simple one. It's hard to pick up an older child and hold them and shake them back and forth. They just become too heavy. The older child can run away better, so they have a little bit better defense, and they also can control their neck better.

The problem with infants is that where one-eighths [sic] of our body length is our head length, alone, for a young infant one quarter of their body length is their head; so it's as if an adult had a head twice as big but supported on the same size neck; so that when a child is picked up and shaken the repeated oscillations back and forth cause the skull that's one of certain kind of density and the brain which is of a different density, they will start varying on how fast they go back and forth; and at one given moment the brain will be going one way and the skull will be going the opposite way. What we call bridging veins that go in between the two will be stretched to their limits, snapped; and then we'll have the bleeding that we call subarachnoid or subdural hemorrhages. There can also be more direct injury right to the brain itself, occasionally in some cases to the spinal cord. The oscillations back and forth also seem to account for the retinal hemorrhages.

The trial court noted that the defendant's defense at trial was that

Devrick's death is the direct result of a previously unknown physical condition of the child, frontal brain atrophy, aggravated when the defendant after observing the child in the midst of a seizure caused by that condition shook the child to arouse him. The child's death, the defense asserts, was an unknown, unfortunate and unforeseeable result of an act done by a concerned parent acting under stress who did not know the child's true medical condition or the danger that shaking to arouse from a seizure presented under the circumstances.

To establish that the injuries of Devrick were not the result of a casual shaking but rather the result of a violent shaking, the State introduced evidence showing that Devrick suffered a severely-swollen brain, swelling about the eyes, bilateral subdural bleeding from the brain, subarachnoid bleeding, and subdural hematomas over the entire spinal cord, all of which were acute rather than chronic. Dr. Schelper, who performed the autopsy, when testifying that the shaking required to cause such injuries was not casual, testified:

[T]his would be a substantial shaking. We're not talking about patting on the back or ... a little rattling. We're talking about such a significant shaking that the head is being forcefully bounced from the chest and then all the way back to hit against the back and then bounced back and forth like this. That kind of rhythmic to and fro motion is what causes the brain and the skull to get out of synchrony with each other because every time the skull hits the chest wall, or at least it stops accelerating forward, then the skull stops but the brain continues to move forward for a little while now. On top of that the head becomes pulled backwards by this to and fro shaking so that the brain will eventually begin to get this to and fro rocking....

[T]hat requires a reasonable substantial physical effort to shake something that weighs a number of pounds hard enough to get that type of motion.

## I.

Our review is on assigned errors of law. Iowa R.App.P. 4. The main thrust of the defendant's appeal centers around that part of the State's evidence which revealed that in May of 1987 defendant had been responsible for injuries to his twin boys, Damion and Devon, caused by shaking. In this respect, Iowa Rule of Evidence 404(b) provides in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As we stated in *State v. Williams*, 445 N.W.2d 408, 409 (Iowa App.1989):

Under rule 404(b), evidence of prior acts may be admissible (1) if the evidence is relevant to a legitimate issue involved in the case and (2) there is clear proof the individual against whom the evidence is offered committed the prior act.

We find both prongs of the *Williams* test to have been satisfied here.

First, there was clear proof that defendant committed the abusive acts which resulted in the twins' injuries. On April 6, 1987, the twins were born to Lynette Slater and defendant. Ms. Slater is employed by the United States Coast Guard. On May 14, 1987, Slater was scheduled to work a twenty-six-hour shift. As a result, Slater left the twins in defendant's sole care. The next day, after Slater picked up the twins, she noticed that Damion was sleeping excessively. On May 16, Damion was listless and unresponsive, nor would he feed. Slater then took the twins to Singing River Hospital. Upon being informed that child abuse was suspected, defendant for the first time told Slater that the twins had fallen from their unrestrained carriers when an automobile pulled in front of his car.

The twins were released from Singing River Hospital, but Damion's condition deteriorated. On June 4, defendant called Slater at work to inform her that Devon's frontanel was bulging. Slater returned from work and took the twins to the emergency room at Keesler Air Force Base Hospital, a large tertiary care military hospital. The physicians at Keesler diagnosed both boys as suffering from nonaccidental head trauma resulting from shaking. The State's evidence clearly showed that the twins suffered their injuries from shaking at some point during defendant's care of them. As such, the second prong of the *Williams* test was satisfied by the State. Additionally, we find the evidence of defendant's prior abusive acts with the twins was relevant to show intent, knowledge, or absence of mistake or accident, thereby meeting the first prong of *Williams*.[1]

## II.

Defendant also requests this court to overrule the holding of the Iowa Supreme Court in *State v. Beeman*, 315 N.W.2d 770, 776–77 (Iowa 1982), and impose the "independent felony" rule. Our supreme court rejected such a request in *State v. Ragland*, 420 N.W.2d 791, 793 (Iowa 1988). As the supreme court has pointed out in *State v. Eichler*, 248 Iowa 1267, 1270, 83 N.W.2d 576, 578 (1957): "If our previous holdings are to be overruled, we should ordinarily prefer to do it ourselves." We are obliged to decline defendant's invitation to overrule *Beeman*.

Under Iowa law, an individual is guilty of felony murder if the individual kills another while participating in a forcible felony. *See* Iowa Code § 707.2(2). Felonious child endangerment constitutes a

---

1. It is clear from the trial court's ruling that the evidence of defendant's prior abusive acts was considered for its probative value of motive, intent, or absence of mistake or accident only. It was not considered "to prove the character [of the defendant] in order to show that he acted in conformity therewith."

forcible felony. *See* Iowa Code § 702.11. As such, felonious child endangerment may constitute the basis for a felony murder charge. *Cf. State v. Ragland,* 420 N.W.2d 791, 793 (Iowa 1988) (willful injury may constitute basis for murder felony conviction); *State v. Mayberry,* 411 N.W.2d 677, 682–83 (Iowa 1987) (assault with intent to commit sexual abuse sufficient to support finding of felony-murder). We find defendant's arguments on this issue to be without merit.

AFFIRMED.

DONIELSON, P.J., concurs.

SACKETT, J., specially concurs without opinion.