# IN THE COURT OF APPEALS OF IOWA

No. 15-1212
Filed February 22, 2017

**FIRST AMERICAN BANK GROUP, LTD.,**
  Plaintiff-Appellee,

**vs.**

**IOWA DEPARTMENT OF TRANSPORTATION,**
  Defendant-Appellant.
_____

Appeal from the Iowa District Court for Woodbury County, Jeffrey L. Poulson, Judge.

The Iowa Department of Transportation appeals a condemnation award. **AFFIRMED.**

Thomas J. Miller, Attorney General, Robin G. Formaker and Richard E. Mull, Assistant Attorneys General, for appellant.

Daniel L. Manning, Sr. and Joel B. Templeman of Lillis O'Malley Olson Manning Post Templeman L.L.P., Des Moines, for appellee.

Heard by Vogel, P.J., and Vaitheswaran and McDonald, JJ.

**MCDONALD, Judge.**

In November 2013, the Iowa Department of Transportation (IDOT) condemned First American Bank Group's (the bank) leasehold interest in property at 800 Gordon Drive in Sioux City. The bank entered into the lease agreement for the property at issue in 1999. Although the bank's lease expired in September 2014, the bank held five additional five-year options to renew the lease agreement, potentially extending the lease agreement to September 2039. The bank's president and CEO testified the bank intended to exercise each of the options due to the favorable lease agreement and location of the property. Following jury trial, the bank was awarded damages in the amount of $1,160,491. On appeal, IDOT raises several claims of error, which we address in turn.

I.

The fighting issue in this case was the valuation of the bank's leasehold interest. IDOT's first argument is the district court erred in admitting the report and testimony of the bank's expert witness, Michael Olson, a real estate appraiser. IDOT contends Olson's appraisal model, which IDOT dubs the "unsophisticated investor model," was contrary to Iowa law because it was not based on fair and reasonable market value. The report and testimony, IDOT argues, should have been disallowed as not relevant under the controlling law.

The parties disagree as to the proper standard of review. IDOT contends the admissibility of the testimony raises a question of law because Olson's report and testimony relied on appraisal method inconsistent with Iowa law. *See Whitley v. C.R. Pharm. Serv., Inc.*, 816 N.W.2d 378, 385 (Iowa 2012). The bank contends the standard of review is for an abuse of discretion because the

admissibility of an expert's report and testimony is at the discretion of the district court. *See Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). We need not resolve the argument because we conclude the district court did not err or abuse its discretion in allowing the report or testimony into evidence.

The general rule is that relevant evidence is admissible and irrelevant evidence is inadmissible. *See* Iowa R. Evid. 5.402. Relevancy is distinct from the probative value of the evidence. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. "Relevance is contextual; it is determined by the issues raised and other evidence introduced analyzed within the framework of the applicable law." *Gibson v. Buckley*, No. 14-1108, 2015 WL 2394116, at *3 (Iowa Ct. App. May 20, 2015). The probative value of evidence "gauges the strength and force" of the evidence's tendency to make a consequential fact more or less probable. *State v. Plaster*, 424 N.W.2d 226, 231 (Iowa 1988).

To determine whether Olson's testimony was relevant and admissible, we must first examine the relevant law. The jury was provided the following instruction regarding damages:

> The tenant, First American Bank Group, Ltd., had a lease on the property. The lease was to run to September 30, 2014, and the tenant was operating a bank on the leased property. The tenant had five five-year options to renew which could be renewed at the end of each term one at a time. The tenant's interest has been condemned by the acquiring agency.
>
> The measure of the tenant's damages is the fair and reasonable market value of the unexpired term of the lease

immediately before the condemnation, taking into account the building, fixtures, and personal property on the premises, less the future rent to be paid, and the reasonable value of personal property removed by the tenant after the date of the condemnation.

The following factors may be considered in determining value:
1. The location of the premises, its surroundings and its accessibility.
2. The use to which the premises has been put.
3. Improvements to the premises.
4. The nature, character, type and general construction of the building and fixtures located on the premises.
5. The depreciation of the buildings, fixtures, and personal property since their construction or purchase.
6. Any other pertinent facts disclosed by the evidence.

The instruction was not objected to, and it is controlling with respect to the determination of whether the testimony was relevant and thus admissible. *See Bus. Ventures, Inc. v. Iowa City*, 234 N.W.2d 376, 384 (Iowa 1975) (holding where the damages instruction was not objected to in condemnation case, the instruction became the law of the case and the experts could provide opinion evidence regarding damages as instructed).

Independently, we conclude the instruction was a correct statement of the law. "The measure of damages for the taking of a leasehold interest is well-established. It is the market value of the unexpired term of the lease over and above the rent stipulated to be paid." *City of Des Moines v. Housby-Mack, Inc.*, 687 N.W.2d 551, 554 (Iowa 2004). Although the formulation appears uncomplicated, our cases have discussed "at length the difficulty of fixing the value of leaseholds" and the "various elements" that could be relevant depending on the "facts in each case." *Interstate Fin. Corp. v. Iowa City*, 149 N.W.2d 308, 311–12 (Iowa 1967).

It is impossible to specify all of the elements that enter into such a problem. In fact all of them cannot be anticipated, and many of them are developed in the course of the litigation consequent upon the exercise of the right of eminent domain. They will vary with the character of the property affected and the uses to which the property is applied.

*Id.* In the leading case, our supreme court stated:

The instant case is not in tort, although it sounds in damages and is in effect a feigned issue to determine just compensation to which plaintiff had a right by reason of the lawful taking of its property for public use. The question is how to apply the rule for the estimation of damages occasioned by the condemnation of a leasehold interest. The decisions are not harmonious. Ordinarily market value is the criterion, but in certain cases it is not the true standard by which to determine the value. It is difficult, if not impossible, to lay down a rule of universal application as to what may be considered as elements of damage, as the equities of the parties must more or less depend upon the particular facts and circumstances of each case. This is particularly true as applied to a leasehold. Value must be determined by a consideration of the uses to which the property is adapted. All circumstances naturally affecting this value are open to consideration.

*Des Moines Wet Wash Laundry v. City of Des Moines*, 198 N.W. 486, 489 (Iowa 1924) (citation omitted). The instruction thus correctly sets forth the critical elements of the law and the relevant factors to be considered.

This brings us to Olson's report and testimony. Olson's report set forth his appraisal method: "In the case of a leasehold interest the value can be quantified by discounting, at a proper rate, the rent advantage enjoyed by the lessee, or the difference between contract rent and market rent." Olson's report and testimony showed he estimated the value of the leasehold by finding the rental advantage, if any, to the bank over the life of the lease agreement, including renewal periods. Specifically, he testified he identified the "contract rent" over the term of the lease, including renewal periods, as set forth in the

lease agreement. He testified he determined a market lease rate based on comparable properties. In his opinion, the bank had entered into a favorable lease agreement. He opined the bank would pay substantially less than market rent over the life of the lease agreement. Over the life of the lease agreement, including renewal periods, Olson testified the bank had a rental advantage of $1,696,000. Because the total rental advantage extended over a period of twenty-five years, Olson reduced the total market-based rental advantage to its present value: "In theory, [the bank] should be entitled to $1,700,000 or $1,696,000, whether it was spread out or in one lump sum. But when we spread it out like that, then we need—typically we bring it back to present value." For the purposes of discounting the bank's rental advantage to present value, Olson used a discount rate of two percent. The two-percent rate was based on what an "ordinary person of prudence" would "expect for [a] reasonable return on their investment." Olson's selection of a discount rate for the purposes of reducing the rental advantage to present value relied on the bank's second expert witness, Dr. Goss. Dr. Goss, a professor of economics, offered an opinion regarding the appropriate discount rate based on what a person of reasonable prudence, or an "unsophisticated investor," would expect to realize over the relevant period taking into account inflation and expected interest rates. Relying on Dr. Goss's opinion regarding the discount rate, Olson concluded the present value of the damages was $1,325,000.

To understand the bank's criticism of Olson's report and testimony, it is necessary to contrast Olson's appraisal with IDOT's appraisal. IDOT's appraisal expert, Patrick Schulte, calculated the rental advantage in the same way Olson

did. Schulte's report provided, "The primary determination of whether a tenant has a valuable leasehold interest is whether the tenant has the ability to occupy the specified real estate at a rent amount which is below market rent, creating a long term rent advantage." The report concludeed "there is a measurable tenant leasehold advantage" in the amount of $1,160,491. Unlike Olson, Schulte did not directly reduce the rental advantage to present value. Instead, Schulte applied an income approach to determine the present value of the hypothetical income stream the bank would achieve if the bank were to sublease the property. This was contrary to the bank president's testimony that the bank intended to renew each of the options because of the favorable rental advantage. Regardless, based on his estimated income approach, Schulte concluded the discount rate should be greater than the average commercial capitalization rate in the area "since the tenant leasehold normally has greater risk than the underlying landlord interest." Based on these assumptions, Schulte discounted the hypothetical income stream by nine percent, arriving at a present value of $450,814, rounded to $450,000.

IDOT argues Olson's opinion should have been excluded because Olson, unlike Schulte, did not rely on a commercial capitalization rate to reduce the rental advantage to present value. We see nothing impermissible in Olson's estimation of damages. As noted above, damages to be assessed for the condemnation of a leasehold, is the "market value of the unexpired term of the lease over and above the rent stipulated to be paid." *Housby-Mack, Inc.*, 687 N.W.2d at 554. Olson determined the rental advantage by comparing the leasehold interest at issue with comparable leases, i.e. he performed a market

analysis to determine the rental advantage. The rental advantage is the bank's "damages" for the purposes of the condemnation proceeding. Olsen then reduced the "damages" to present value to avoid overpayment. There is a distinction between what Olson did—selecting a discount rate to reduce the bank's damages to present value—and what Schulte did—selecting a discount rate above market capitalization rates to reduce to present value a hypothetical income stream subject to the risk of the local commercial real estate market. Our case law has specifically approved of Olson's approach in selecting a discount rate for the purposes of reducing future damages to present value:

> *A. Theory.* Present value analysis is the method used to determine the value today of future losses or expenses. *See* Ward S. Curran, *Present Value Analysis in Estimating Damages in Torts*, 72 Connecticut B.J. 375 (1998). It accounts for the reality that "money has the power to earn money." Jacob A. Stein, 2 *Stein on Personal Injury Damages* § 6:16 (3d ed. 1997). Plaintiffs can realize earnings through the investment of an advance lump sum award, which effectively over-compensates them for their injuries if the award is not discounted. *See Beaulieu v. Elliott*, 434 P.2d 665, 671 (Alaska 1967). A countervailing consideration, however, is inflation, which devalues future damage awards. *Id.* at 671. The United States Supreme Court has recognized that "ours is not an inflation-free economy" and "anticipated price inflation . . . certainly affects market rates of return." *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 538 (1983). Therefore, the modern consensus is that present value reductions should take into account future inflationary pressures. In other words, the rate by which an award is discounted should be offset by an anticipated inflation rate. 22 Am. Jur. 2d *Damages* § 144 (1988). Iowa recognizes this economic reality. *Schnebly* [*v. Baker*, 217 N.W.2d 708, 728 (Iowa 1974)]; *see also Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 658 (Iowa 1969) (upholding expert testimony on present value reduction which took into account both inflation and increased productivity of economy).
>
> *B. Practice.* Although there is a growing consensus that anticipated inflation should be considered in a present value analysis, there is little agreement on the preferred methodology. *See* 22 Am. Jur. 2d *Damages* § 143; 3 *Stein on Personal Injury Damages* § 15:11 (3d ed. 1997). Courts generally have adopted

one of three approaches: (1) the current dollar earnings and current interest rate or "inflate-discount" method; (2) the real earnings and real interest rate or "real interest rate" method; and (3) the "total offset" method. *See* Curran, 72 Connecticut B.J. at 377; Michael I. Krauss and Robert A. Levy, *Calculating Tort Damages for Lost Future Earnings*, 31 Gonzaga L.R. 325, 341 (1995-96). The first approach projects future damages with inflation built in. Curran, 72 Connecticut B.J. at 380; *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1200 (7th Cir. 1982). The second approach projects damages without inflation and discounts those damages at an interest rate that does not have inflation built in (real interest rate). *Id.* The third approach assumes that the discount rate is completely neutralized or offset by the inflation rate. *Pfeifer*, 462 U.S. at 544.

Our legislature has not mandated a particular approach to discount future awards to present value, nor has it prescribed a discount rate to be applied by the fact-finder. *See* Iowa Code § 624.18. Therefore, we turn to case precedent.

Although our highest court has not explicitly mandated a particular methodology, it has affirmed the use of the total offset approach where there is evidence from which to conclude that the discount and inflation rates are the same. *Schnebly*, 217 N.W.2d at 728. Additionally, the court has rejected use of the legal rate of interest to reduce future damages to their present value, adopting instead the rate ***"found by the jury from the evidence to be fairly expected from reasonably safe investments which a person of ordinary prudence, but without particular financial experience or skill, could make in the locality."*** *Von Tersch v. Ahrendsen*, 99 N.W.2d 287, 291 (Iowa 1959).

*Gleason v. Kueker*, 641 N.W.2d 553, 555–56 (Iowa Ct. App. 2001) (emphasis added).

Even assuming IDOT's argument was correct, the argument only goes to the weight of the evidence and not its admissibility. Iowa Rule of Evidence 5.702 authorizes expert testimony where helpful to the jury. Iowa adheres to a rule of liberal admissibility with respect to expert testimony. *See Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 306 (Iowa 1998). Receipt of opinion evidence is a matter within the trial court's discretion. *Iowa-Ill. Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 827 (Iowa 1993). We will not disturb the trial court's decision

absent a manifest abuse of that discretion. *Id.* We cannot say the district court manifestly abused its discretion in allowing the evidence.

II.

IDOT next argues the jury's verdict did not conform to the evidence and the district court should have granted IDOT's motion for new trial on this ground. Denial of a new trial is reviewed for abuse of discretion. *See WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 49 (Iowa 2008). IDOT asserts three bases for new trial. First, new trial is warranted when excessive or inadequate damages appearing to have been influenced by passion or prejudice were awarded. Iowa R. Civ. P. 1.1004(4). Second, new trial is warranted when there has been error in fixing the amount of the recovery in an action for detention of property. Iowa R. Civ. P. 1.1004(5). Finally, new trial is warranted when the verdict is not sustained by sufficient evidence. Iowa R. Civ. P. 1.1004(6).

Some context is necessary to resolve the claim. As mentioned above, Olson opined the present value of the bank's rental advantage was $1,325,000. Schulte opined the bank's rental advantage was $1,160,491. He further opined the market value of the rental advantage was $450,000. During deliberations the jury submitted the following question to the district court: "Does the value of the leasehold interest need to be $450,000 or $1,325,000; can we determine the discount rate invalid and award a value of $1,160,491.00?" After consulting with the attorneys, the district court instructed the jury as follows:

> The value of the leasehold interest . . . is a fact which you as a jury are to determine. You are not limited to the specific amounts of $450,000 or $1,325,000. Choosing a discount rate is an element used by both appraisers in reaching an opinion of value. You as a

jury may rely upon such evidence as you find reliable, including establishing a discount rate in calculating an award.

After receiving this instruction, the jury found the value of the leasehold interest was $1,160,491. Of course, the jury's award is the rental advantage calculated by Schulte.

IDOT contends the jury simply refused to apply a discount rate to Schulte's calculation of the bank's rental advantage and this "obvious oversight" merits correction. *See Budge v. Post*, 643 F.2d 372, 376 (5th Cir. 1981); *see also Hous. Auth. of City of Hartford v. Charter Oak Terrace/Rice Heights Health Ctr., Inc.*, 810 A.2d 333, 339–40 (Conn. Super. Ct. 2002) ("For a leasehold to suffer damages, it must have value. Generally, a leasehold has value if the fair market value of the property, sometimes called economic rent, is in excess of the rent reserved in the lease. In the case of a total taking of property, the accepted method of assessing damages to the leasehold is to determine the annual difference between the contract rent and the economic rent, to multiply the annual difference by the number of years left under the lease, and then to discount that sum to determine its present value."); *Village of Orland Park v. Orland Park Bldg. Corp.*, No. 1-13-0623, 2015 WL 4459076, at *2 (Ill. App. Ct. July 20, 2015) (considering discount rate); *Matter of Acquisition of Prop. by Eminent Domain*, 949 P.2d 1115, 1121 (Kan. 1997) (approving use of discount rate); *Land Clearance for Redevelopment Corp. v. Doernhoefer*, 389 S.W.2d 780, 788–89 (Mo. 1965) (reversing such an award where the trial court explicitly did not apply a discount rate); *Land Clearance for Redevelopment Auth. v. W.F. Coen & Co.*, 773 S.W.2d 465, 471–72 (Mo. Ct. App. 1989) (applying discount

rate to calculate lessee's interest); *City of Johnson City v. Outdoor West, Inc.*, 947 S.W.2d 855, 861 (Tenn. Ct. App. 1996) (considering discount rate); *City of Puyallup v. Hogan*, 277 P.3d 49, 57 (Wash. Ct. App. 2012) (considering discount rate).

Under the circumstances, we cannot conclude the district court abused its discretion in denying IDOT's motion for new trial. First, it does not appear the jury disregarded any of the district court's instruction. The bank requested an instruction requiring the jury to apply a discount rate to reduce the rental advantage to present value, *see Gleason*, 641 N.W.2d at 555 n.4, but IDOT objected to the instruction. In addition, the district court instructed the jury it could rely on the evidence it found reliable, including the determination of a discount rate, if any. Perhaps the jury concluded no discount rate should be applicable under the circumstances. We cannot speculate. Further, the *Gleason* case, cited above, states it is acceptable to conclude no discount rate should apply where there may be an offset due to inflationary pressures. *See id.* at 555.

A "judge cannot, under the guise of amending the verdict, invade the province of the jury or substitute his verdict for theirs. . . . [T]he verdict must be not what the judge thinks it ought to have been, but what the jury intended it to be." *Ostrem v. State Farm Mut. Auto. Ins. Co.*, 666 N.W.2d 544, 546 (Iowa 2003). Ultimately, the resolution of the "battle of the experts" on damages was wholly in the discretion of the jury:

> Finally, the court has reaffirmed its faith in the jury to make the present value reduction based on all the relevant facts and circumstances shown by the evidence. [*Von Tersch*, 99 N.W.2d at 291]; *see also Jenkins Truck Lines, Inc.*, 170 N.W.2d at 664 (noting juries could draw inferences from material matters shown); *Jackson*

*v. Chicago, M., St. P. & P.R. Co.*, 30 N.W.2d 97, 105 (Iowa 1947) (noting jury's wide discretion in assessing personal injury damages, including discretion to consider lessened purchasing and earning power of money); *accord St. Louis, I.M. & S.R. Co. v. Needham*, 52 F. 371, 378 (8th Cir. 1892) (noting "human ingenuity seems incapable of formulating a rule which shall specify every circumstance, chance, and probability that a jury may consider, and none that it may not . . . ."). While certain courts have questioned the wisdom of relegating such a complex economic calculation to a jury, others have noted that the use of economics in a litigation setting is in any event less than exact and the determination should be left to the sound discretion of the jury. *See Cox v. Crown CoCo*, 544 N.W.2d 490, 500 (Minn. Ct. App. 1996); Florida Uniform Civil Jury Instruction 6.10, comment 2; *cf. O'Shea*, 677 F.2d at 1201; 3 *Stein on Personal Injury Damages*, § 15:3. Iowa appears to have endorsed the "sound discretion" approach.

*Gleason*, 641 N.W.2d at 556–57. IDOT presented its evidence and made its argument regarding valuation to the jury. It was within the "sound discretion" of the jury to determine the rental advantage, if any, and to reduce to present value the rental advantage the bank lost by condemnation at whatever rate it deemed appropriate based on the evidence. Here, the jury's verdict is within the range of the evidence, which is a "strong indicator" the propriety of an "award of damages in a condemnation case." *Peoples Natural Gas Co. v. City of Everly*, 497 N.W.2d 872, 873 (Iowa 1993). In sum, we cannot say the court abused its discretion in denying IDOT's motion for new trial.

## III.

IDOT next contends the district court erred in excluding the testimony of Dr. Arthur Cox. Dr. Cox is a professor at the University of Northern Iowa who teaches real estate appraisal methodology and investments. IDOT intended to call Dr. Cox to testify the bank might not exercise all its lease renewal options and to "opine as to the reasonableness of the discount rates" employed by the

appraisers. The bank moved in limine to prohibit Dr. Cox from testifying on the issue of whether the bank would exercise its renewal options as purely speculative. The bank also moved in limine to prohibit Dr. Cox from testifying regarding the value of the bank's leasehold interest. The bank contended Dr. Cox's testimony regarding valuation would constitute improper bolstering of Schulte's opinion because Dr. Cox did not perform any independent calculations of value and instead merely adopted Schulte's calculations. In ruling on the motion in limine, the district court ruled Dr. Cox's "opinion concerning whether [the bank] would have exercised one or more of its options . . . is speculative and should not be considered" and his "proposed testimony on the value of [the bank's] leasehold interest and his testimony on the discount rate is an attempt to unfairly bolster [Schulte] and must be excluded." The court made a similar ruling post-trial.

The district court did not abuse its discretion in precluding Dr. Cox from testifying on the issue of whether the bank would exercise its options to renew the lease agreement. His opinion on the matter was wholly speculative. The bank president and CEO testified the bank intended to renew all of the lease options because of the favorable lease agreement and the favorable location. The bank's intent to renew the lease was evidenced by a substantial addition it made to the property. Moreover, both sides seem to concede the inevitability of the bank exercising its options, absent government intervention, at this desirable property.

Nor can we conclude the district court manifestly abused its discretion in disallowing Dr. Cox's testimony regarding valuation and the discount rate. Dr.

Cox did not offer an independent opinion on the issues. Instead, his deposition testimony shows he merely reiterated Schulte's analysis. In the absence of forming an independent opinion, Dr. Cox's testimony was merely duplicative of Schulte and constituted improper bolstering. The district court ruled accordingly.

IV.

IDOT next contends the district court erred in not allowing it to cross-examine Olson regarding a prior ethical infraction. Olson was the subject of an ethics complaint by the Iowa Real Estate Appraiser Examining Board in 1997. He entered into a consent order in which he admitted no wrongdoing. As remediation, Olson was required to take educational courses. IDOT wished to cross-examine Olson regarding the complaint and the consent order. The court denied IDOT's request.

We review evidentiary rulings for abuse of discretion. *State v. Tracy*, 482 N.W.2d 675, 680–81 (Iowa 1992). Disbarment has been held admissible as to a witness's credibility. *See In re Thorman's Estate*, 144 N.W. 7, 9 (Iowa 1913). But Olson was not disbarred (or subject to the real estate appraiser's equivalent). As the district court held, this situation is more analogous to that of *McClure v. Walgreen Co.*, 613 N.W.2d 225, 234–37 (Iowa 2000). There, evidence was admitted showing "charges" against a pharmacy related to its licensure. The pharmacy entered a stipulation that admitted no wrongdoing; that stipulation was also entered into evidence. The supreme court held the evidence was irrelevant—and seemed to suggest it was more prejudicial than probative, although its determination on relevance obviated the need to reach that question—and remanded for a new trial. *See McClure*, 613 N.W.2d at 234–37.

*McClure* is directly on point and the district court's ruling was not an abuse of discretion.

V.

Finally, IDOT requests remittitur. Remittitur is not authorized in a condemnation case. *Booras v. Iowa State Highway Comm'n*, 207 N.W.2d 566, 570 (Iowa 1973). "It is the constitutional right of an owner in most jurisdictions not only to receive just compensation for the property taken from him, but also to have the amount of that compensation awarded to him by a jury." *Id.* at 569. IDOT requests we overrule *Booras*. We are not at liberty to overrule our supreme court. *See State v. Hughes*, 457 N.W.2d 25, 28 (Iowa Ct. App. 1990).

VI.

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**